The panel has before it a total of six cases. Three are being submitted on the briefs later today without the benefit of oral argument. Those three cases are Arnold v. Federal Deposit Insurance Corporation, Appeal 2007-3304, Kuykendall v. Office of Personnel Management, Appeal 2007-3320, and Nowmenko v. United States, Appeal 2008-5021. On our argument list, we'll hear first Scanner Technologies v. Icos Vision, Appeals 1399-2007 and 1081-2008. Mr. Niederlucky, good morning to you. Welcome to the court. Please proceed. Good morning. Curt Niederlucky on behalf of Appellant Scanner Technologies. I imagine the court's big question is, how could Scanner's view of this case be so drastically and diametrically opposed to the district court's view? Well, I believe the answer is found on page 14 of the district court's opinion. And at page 14, which is at addendum 18, the district court said, at the time Scanner's attorney was preparing the petition to make special, he rewrote the claims of the patent to track Icos' literature as closely as possible. The district court apparently took great offense at the notion that Scanner would actually write claims to track and cover Icos' product. On this point you're making, what issue does this bite on? Does it bite on inequitable conduct? Does it bite on the attitude the judge had towards your client? It goes to the attitude the judge had towards our client, and it actually goes across the holdings and actually helps to explain why the court so harshly came down upon our client, and we think made several legal errors and was further so… So you think the judge was shocked by this, even though this was put forth in one of the proposed findings of facts that this happened, and the other side said, sure, and there's actually nothing wrong with that? We certainly said that, Your Honor, sure. We did do that, and there's nothing wrong with that. However, even in the trial testimony, the judge, the district court actually interjected and cut off Mr. Beatty's testimony and stated, did I understand you to say just a moment ago that Mr. Leone… It seems to me that with time being short, you might want to address the inequitable conduct issue and the obviousness issue. That takes your patent out of play, right? Certainly. You've got a patent that says dead as a doornail, unenforceable and obvious, all the claims obvious. Yes, and I do want to address… That's a flagpole that needs to be curled up quick. I will do that, Your Honor. In the finding of inequitable conduct, the district court abused its discretion in finding that the patents ensued were unenforceable. The district court did two things. First of all… It drew inferences from facts, right? It didn't just draw inferences. It drew strained inferences and then did not hold the… Well, you claim they're strained. The other side says they're not strained. But it wasn't the facts that were declared false. It was the inferences that the court decided to draw from the facts that it then put up as a straw man and said, as I infer, that would be false. Well, you better be very specific. Well, for instance, Mr. Leone never said in his petition to make special that he saw the IQOS device. So therefore, it has to be a clearly erroneous finding of fact to say that he did so represent. Correct. And what about the other things that the trial court found? Well, the other one you have is his statement of seeing it. There certainly is no question that he made a rigid comparison. And in fact, in the claim chart that's provided with Mr. Leone's petition, it is laid out and for each claim and each part of that claim, there's a representation of where it came from. And those were the IQOS product literature. So it was very clear from… Okay. So for those two reasons, you say that the finding was clearly erroneous. But what about the other findings? With Mr. Beatty? Well, there were four or five different things the district court found that were wrong. Yes. And Mr. Beatty's statement. So first you have the Leone statements that he did or did not see it, which he never said. Yeah, we covered that. Okay. And then you have Mr. Beatty's statements. Mr. Beatty's statements, for instance, that the device was on open display at a trade show. Now, certainly it strains the mind to say that that means that Mr. Beatty disassembled his device in front of everyone. To be on open display at a trade show means to be available for viewing. And the court's interpretation of that statement to mean it was in a disassembled state such that you could see completely inside of it, and then to say that that was a false statement, which was never made… And then you've got Mr. DeProfitt taking copious notes and the question of whether or not he was or was not present at one of the trade shows, right? Whether or not Mr. DeProfitt saw the device, actually inspected the device at one of the trade shows, I think was one of the issues the court raised. There was an issue as to whether or not there were copious notes that were taken on the device at the trade show, too, weren't there? Yes, and Mr. DeProfitt actually both said he never took notes, but then later on had to recant that testimony when notes were in the records of ICOs that showed that he had notes. So the question turns on what the definition of copious is? Is that the idea? Well, certainly, and what we're coming to, and I think I want to move on to, Your Honors, is that regardless of these statements, and we believe they are clearly erroneous findings of fact that the court made, even if one of the statements that the district court had sufficient basis to find that fact, the issue is these facts, these statements did not go to patentability. And there is no per se rule that a false statement creates an inequitable conduct. You seem to want to overlook the fact that this supposed error took place in the context of a petition to make special. I certainly don't want to overlook that. We have a very explicit case that says if you made a statement and the statement resulted in, and the statement was incorrect, and the statement resulted in your application being advanced, then you're dead. Yes, and you're speaking of the General Electoral case. Yeah. And the question is whether or not these statements advanced this petition, advanced the application. Was the application advanced or not? The application wasn't advanced. It was taken out of order, correct? It was advanced, but it was not advanced based on the statements that were alleged to be false. How do we know that? How do we know it's not advanced? No, no, how do we know that it was advanced for other reasons, not the reasons that were misrepresentations? Because we look to the requirements of the MPEP, and the MPEP have two requirements to advance. And the requirements are that the applicant has done a rigid comparison of the device to the claims and believes they are unquestionably infringed. And the second requirement is that a prior art search is done. Now, in the General Electoral case, the second requirement was where the false statement was made. A false statement was made that a prior art search was done when in fact it didn't, and the examiner was relying on that in order to expedite the application. And we know that because the reg says that's what he has to rely on? Yes, there are requirements. And in fact, there is no question here, there has been no challenge to the veracity of Mr. Leone's statements that in fact he did a rigid comparison of the claims to the product. The only question was that the court inferred was did he actually physically see the product? And there's no requirement that you actually have to physically view the product. But what about the trade show findings? The trade show findings have, frankly, Your Honor, nothing to do with the question of whether or not there was sufficiency in Mr. Leone's. How are we so sure of that? I mean, are you saying that the kind of findings made by the district court here relating to the trade show couldn't possibly have weighed in the decision of whether to make special or not? That they're somehow outlawed? You may not consider anything that happened at a trade show. There's no outlaw for what the patent examiner can do. However, there is no relation between Mr. Beattie's statements, true or false, and the requirements to grant the petition. Well, I understand that it's not required. What I'm trying to figure out is is it wholly irrelevant? And if so, why do you say that? We believe it's wholly irrelevant because even given Icos's argument that somehow this goes to some secondary factor of non-obviousness. That's what I wanted to ask you about. Let's assume that the affidavit, instead of talking about copious notes and whatnot, said that they believe that the other side had slavishly copied, had so carefully inspected your client's invention, they had slavishly copied every jot and tittle of it in absolute, like a flat anticipation. If they had made that argument, wouldn't they have been whispering or sending a little news to the examiner saying there's a secondary consideration here, favoring our patent as being non-obvious because they had to slavishly copy it? Well, first of all, I don't think you examine secondary factors unless you have a prima facie case of obviousness. So the secondary factors would be provided. You think then a false statement, let's assume you had an application and someone made an absolutely false statement with regard to secondary considerations. They said to the examiner, you know, here are all these secondary considerations that weigh in favor of my patent being non-obvious just in case you find a prima facie case. And all those statements were flatly false. You'd fall for inequitable conduct, wouldn't you? You can't lie to the patent. I don't think, I think later on that might be the case if there was a rejection or a lack of a rejection. So you think a false statement with regard to secondary considerations is totally irrelevant for inequitable conduct purposes unless the examiner enters a rejection, prima facie, obviousness rejection? No, I wouldn't say that. But I would say in the context of a petition to make special, that activity in the petition to make special does not create... Can I ask you a question about, I mean, assume for purposes of argument, which you don't want to assume, that we were going to affirm the obviousness determination on claim one? So just assume that for purposes of argument. Okay. Okay. So then the question is, do the other claims go down? The trial judge said the other claims are obvious as well. And that gets us to the so-called stipulation. Yes. This is finding of fact 37 in the proposed findings of fact, right, which is at 6955 of the record. This is ICO's proposed findings of fact. And they say there's been a stipulation at some earlier point in time that the whole case stands or falls on claim one. And your side admitted that, said, yes, we admit that. Where is the stipulation? Your Honor, I'm not aware of that stipulation. Well, now, wait a second. You may not be aware of it, but your client admitted that there had been such a stipulation. The stipulation which our client has as the proposed finding of fact number nine, in which the court adopted in its decision, was the stipulation that the claim terms that this court had previously determined. Yeah, but that relates to an earlier case, doesn't it? It relates to a stipulation that the parties and the court were going to apply the same instructions. The statement in 37, sir, says stipulated that the case, not that claim construction or not that some sub-issue, it says have stipulated that the case, the whole case stands or falls on claim one. Whole case. Now, there has to have been a stipulation to that effect if somebody was going to admit it. Now, maybe you admitted the wrong thing. Maybe when you wrote in the answer to the question 37, you wrote true. You should have written true for purposes of claim construction only. Certainly, it could have been more clear, but the court's decision. Well, as it stands, it's a concession that claim one governs the case, the case, all issues in the case. I don't believe that to be factually correct. I don't believe the court understood that to be factually correct. Was there any time of mistake? Did you try the case? I did not try the case. Your law firm didn't try the case. No, we didn't. Have you talked to people who tried the case? Not with regard to that issue. Why not? I mean, if you look at this, I mean, they wrote this finding of fact, and they say the two parties have stipulated. That, in lawyers' language, means that they got together either in a room or on the telephone, and they discussed the subject, and they stipulated. We're stipping. And then there's an admission. Your Honor, if the parties had stipulated to that broad fact, my question would be, where in the record is that stipulation? Granted, the parties should have been more clear. I don't need that. I'm asking you. Somebody should have produced the stip from the record that says, no, no, no, it's limited. What we did is we have a finding of fact that says the stipulation, which the court, in its interpretation, referred to both the proposed findings of fact, and concluded with its firsthand knowledge that those two stipulations combined to state that the parties were stipulating that the claim construction would apply to all of the claims, not just one. You're saying that that stipulation is limited to claim construction, not to the case. Yes, Your Honor. Yeah, but that stip is unnecessary. The law is perfectly clear that if you have the word dingbat in Claim 1, and you have dingbat in Claim 2, the law presumes that it has the same meaning. And Your Honor, there are two patents here as well. And they were being agreed that they would apply across both of the patents, the method patent and the apparatus patent. By and large, the law presumes that dingbat in the method and dingbat in the apparatus can have the same meaning, too. You don't need a stip to that effect. Your Honor, I see I'm out of time. If you want me to continue responding, I'm happy to do so. All right, we'll hear from the other side, and we'll restore four minutes as you had hoped for rebuttal. Mr. Kunstadt. Good morning.  Good morning, Your Honor. Please proceed. Let me just ask a quick question, and then I'll leave you alone. It has to do with the stipulation matter. Did you or your law firm try this case? No, Your Honor. Did you talk to the people that tried the case? Talked to the client who was present at the trial of the case, Your Honor. Do you know whether there was an actual stipulation that the case stands and falls on Claim 1? The stipulation is what's reflected in the record before the court. Other than that, I know of no written documentation that we could locate about that. But there's no separate document? No, there's no pretrial stipulation, for example. We did not locate any pretrial stipulation in this case. Thank you. May it please the Court, I'm the attorney for ICOS. At counsel table with me today from my firm is attorney Ilaria Maggioni, and also from our co-counsel firm, attorney Brad Kyle. Your Honors, this case is controlled by General Electro and Digital. This case is characterized by Scanner's false declarations in a petition to make special filed with the Patent Office and false testimony at trial. Backed into a corner, Scanner's inventor, Witness Beattie, could only dodge questions by stating that each of his false statements speaks for itself. Well, the question is whether they're false. I mean, you've heard why don't you address the argument that's been made as to why they're not false. You start, for example, with the rigid comparison issue. The MPAP requires the attorney to use those words, right? Yes, Your Honor. So he has to say he wrote the words. So the question then is, when you say you made a rigid comparison, does that mean that you necessarily must have observed the accused device? You can answer that question yes or no. No, I don't think that's correct, Your Honor. That's what the other side's saying. The other side's saying it was wrong to draw an inference that my client had seen the accused device when there's no requirement that you see the device in order to make a rigid comparison. What the requirement is, Your Honor, of not presenting a document which, fairly interpreted in its entirety, is giving a misleading impression to the Patent Office about what happened. And that's the situation in this case because Mr. Beatty gave false information to his attorney. His attorney— Wait, are you going to concede that there was error with regard to the attorney's declaration? No, Your Honor, because— What's wrong with the attorney declaration other than the rigid comparison issue? Your Honor, we never got an appropriate opportunity— What's wrong with the attorney's declaration aside from the rigid comparison issue? The attorney refused to testify, so it's impossible to say what is— Well, I'm just asking you, I mean, tell me what's wrong with it other than the rigid comparison issue. He relied upon erroneous and intentionally false information provided by his client, which he knew or had reason to know was not correct and should not have been given. And what was that? That there was copying by ICOs that the black box— Who said they copied? Mr. Beatty. Where? He said that in his own declaration. Can you point to exactly where he said that? I've got it right in front of me. I'm sure you have it in front of you, right? It's A6018, 920, and 21. A60— Yeah, I want you—you ought to know this better than I do, sir. It's your case, 6018. Statement of L1M Beatty. Now, just show me in there where he said that they copied this. Paragraph 8, Your Honor. For A6019, I state that ICOs are currently making, using, and selling systems that incorporate the invention claimed in the subject application. That doesn't show copying. That just shows coincidence of features. Might have been totally unaware. Copying means intentionally using the same features, not accidentally or independently using the same features. Well, then, Your Honor, paragraph 14 on the same page, he says that Mr. DeProft approached me in December for a two-hour private meeting. Isn't that fact correct? That's correct, isn't it? That's correct. Mr. DeProft did approach this gentleman at the trade show. Well, I don't think that's true. For a private meeting, he—isn't that true? I think it's not true, Your Honor. Well, what's the evidence that it was false? You can't testify here. You can't tell us what the facts are. You have to show us where in the record the fact is established. Mr. Beattie testified in the record that it is not true, that he did not inspect this machine. That's more than a machine now. Let's stick right with, you know, you can't play, you know, apples and pears. Your Honor, this paragraph in the next sentence says he had previously inspected the UltraVim Plus module at the Semicon West show in July, and that's what Mr. Beattie said is wrong, and the trial court says it's wrong. Well, Mr. Beattie testified that he honestly believed that DeProft had been there. There were several people from the company that were there. His memory wasn't exact, but he was—on his best information and belief, he believed that DeProft had been there and that all the folks had been hovering around, right? Your Honor, what he said was that— That's exactly what he said. No, Your Honor, he said that they took copious notes, and that's not what happened at all. Where is the evidence in the record that he didn't take notes, or wasn't there, or the notes weren't copious? You're trying to testify here about what the real facts were. This is not a trial. This is a court of appeals where we're reviewing a record, and you're not giving us any help because you're not showing us where in the record is any foundation for all the arguments and assertions that you're making here. Well, Your Honor, it's in the record. It's exactly recited by the district court in the testimony of Mr. DeProft. I'm not interested in what the district court said. We already read that. I'm trying to figure out what did the witnesses say that show the falsity that you're claiming was proven. Well, the transcript 205, Beattie acknowledged a trial— Wait, wait, what page is that? 205? It's not—the transcript 205—can I have my— Yeah, it's where he's talking about— I believe he was one of the people, of the many people, that came by the booth, right? No, a trial said he could not—Beattie said he could not recall anything specific with respect to DeProft at the show. So when he testified at the trial— He said not anything specific. I do believe he was one of the people, of the many people, that came by the booth. He's got a distant memory, you know what I mean? A bunch of people came. That's 205. If I'm not mistaken, I believe Mr. DeProft was one of those name cards. He had a bunch of name cards. If people came, you know, they handed out the cards to show who'd been there. Your Honor, the— I'm not going to sit here today and tell you I'm absolutely sure because there's so many shows and name cards. You have a specific memory of meeting with Mr. DeProft at the— Correct? Yes, absolutely, he says. At page 6 of our reply brief in the 2007 case, there are citations precisely to the record where Mr. DeProft denied what Mr. Beattie said. So, Your Honor, as attorney, I'm not testifying at all. I cite the court and direct the court's attention to page 6 of our brief, which has the citations to this appendix, which is exactly the same citations to the transcript that's relied on by the district court. Right, and then the question is whether or not there was a clearly erroneous finding of fact in the inferences that the district court drew from the testimony of Mr. Beattie. That's certainly an issue before the court. And that's what we get paid to do, right? And what ICOS contends is that the district court was the finder of fact and he had conflicting testimony from Mr. Beattie. Our case law holds that the trial court is obligated in these inequitable conduct cases to draw all the inferences favorable and unfavorable from a set of data points. I wrote the opinion for the court that said that because in that case the court had not drawn all the inferences favorable to the applicant that they could have drawn. So there are inferences that can be drawn from the data points of the declaration and what the lawyer said. And the question is, have you drawn both sets of inferences and then decided what is correct? And you told us a minute ago with regard to the lawyer's affidavit that you could fairly infer from him saying that he made the rigid comparison that he didn't need to have personally inspected the device in order to do that. There are sets of circumstances which could support the truth of a rigid comparison. That's not the case here. Well, he had a claim chart. He had all the product literature. He's a lawyer, presumably has some training in the art. That's not sufficient, Your Honor, because you cannot tell from that. You certainly wouldn't say that his affidavit belonged to Rule 11, would you? Is it what, Your Honor? His affidavit didn't fail, didn't put him in sanctions territory under Rule 11. But there's no Rule 11 at the patent office that I'm aware of. Well, but I mean he's got the declaration that he's putting in front of the district court and averring to its truth. It's not false. Well, he didn't testify at the district court. That's part of the problem. Privilege was claimed and it was impossible to probe his statements. So the district court was... Did you call him? His deposition was taken, Your Honor, and privilege was claimed and it was impossible to probe this declaration. So the trial court was justifiable to make the inference that when privilege is claimed the testimony would have been adverse. That was well within the discretion of the trial court under the circumstance. And indeed, it's plain common sense that that's what happened. What do you think would be required of him? Do you think he should have taken apart the machine to make a determination? Well, one thing that I support with that kind of statement is if there had been some admission that he went to the trade show himself and he inspected the machine and talked with the salespeople and had some reasonable assurance, but the problem here is that he was relying on completely incredible, unbelievable information with no proper check as far as... Including product reports? Including... The product reports, the high-cost product schedules? Are those incredible and not representative of the product? No, I'm referring to what Mr. Beatty was telling him, that Mr. Beatty was telling him that he showed his competitor what was inside his machine. This is inherently unbelievable. Where did he say that? Where in Beatty's affidavit did he say just what you said? He said that the machine was on open display at the trade show. It was not on open display. Open display means that the computer has to be busted open, if you will, and all the parts lying around on the floor. What does open display mean in ordinary English? How about just an open machine on a table? Just a closed machine, but it's on the table. Is this stack of briefs on open display in the court today? You can answer that yes or no. No, Your Honor, because I have no power to approach the bench and inspect those briefs. I'd be sanctioned if I did that. I asked if the stack of briefs. The outside of the stack is on open display. Is this nameplate on open display? Yes, I think the nameplate is. Do you know what's inside of it? Is it solid or is it hollow? I don't know, Your Honor. But it's on open display. That's right, but when you submit a declaration, you're not, with all due respect, Your Honor, you're not supposed to play word games like that with the patent examiners. That's precisely what's wrong here. You're supposed to be fair and square and candid with the patent examiners and not give rise to suggestions that aren't true. So if someone told the patent examiner that Rob Kunstadt knew what was in the court's briefs, that's wrong, or that he knew he had to know because it was on open display, or to suggest that he must have known because it was on open display. But again, sir, isn't it possible that this is an issue on which you could draw two inferences? I don't think so. Not on this kind of thing, Your Honor. Absolutely not. And I also don't think it's correct that there's anything that compels the district court to treat this as if it was summary judgment. This was not summary judgment. This was after plenary trial with testimony of witnesses, and the testimony was found to be false testimony. Was there testimony from one of skill in the art here, I guess skill in the art of attending trade shows, to testify of what open display meant? I'm not aware of that except for Mr. Kunstadt. In order for your view to prevail, don't you have to point to that testimony? You told me that everybody knows that open display means that the thing is busted open. Your Honor, that's not a matter for experts like claim interpretation or patent file wrappers. That's a matter of ordinary language, of what people would understand from ordinary English. If a scanner is going to misuse ordinary English, create false impressions and understandings. Did you point to a dictionary definition of open display that says open means that the briefs, the stack, each page had to be lined out so you could see it? We could certainly undertake to do some research on that. If the court would like some briefing, we'd certainly undertake to look into that. We haven't done that to date. I don't think that's part of the record per se. Well, it's a little late, isn't it? No, Your Honor. You said it was a factual issue. It's a little late. I think that it's up to the plaintiff, if there was such a definition, to present it to the trial court to be considered a trial. I thought the other side presented their side of the case to say we believe that when we said open display, we simply meant that the product was not locked up in the back room someplace. It was there and it had some writing on it. They knew it had two cameras in it, right? I don't think they presented any dictionary definition that supported their contention, and it's not part of the record so far as I'm aware that the dictionaries support the plaintiff's view. To my knowledge of English, Your Honor, it does not. And the important thing is not to create false impressions on the patent examiners. Why do you keep saying false impressions? Well, what's the evidence that a false impression was received by the patent official who decided the petition to make special? The petition to make special was granted. That doesn't mean that it was granted because he had a false understanding of the facts. Well, I think that while no one knows what's in the mind of the examiner, that's a risk that the plaintiff has to bear. Is the examiner the one who decides whether a petition to make special shall be granted, or is it a different official in the patent office? So far as I'm aware, it's the examiner. I don't think you're correct about that. I think if you check, you'll find out it's a different official, and then once he makes the decision or she makes the decision, it's sent to an examiner either for expedited examination or if the petition is denied for examination in due course. I don't understand how you can stand there and say, oh, the examiner was misled. The relevant official was misled. There's no evidence that anybody was misled. The MPP requires the examiner to consider the evidence that's a record of the last copy. So when the petition to make special says that the competitor went to the show, was on open display, he took notes, he did this, he did that. Why do you even assume the examiner read anything about the petition to make special? Because the examiner is supposed to do his job and read the file. And part of the file, when it includes evidence of alleged copying like this, Section 2141 says it must be considered. That's the requirement of the Patent Office. It must be considered. Then you have to be able to establish that there is clear evidence that passes the clearly erroneous test here that there was copying. No, that there was not copying. There was not copying. No, no, you want to argue that the affidavit that was put in says there was copying. I think that we definitely contend that this evidence put in is raising a difference. No, we talked about that. We talked about that earlier, right? That's right. Your Honor, I think the time is up. I would only say that we do have extra copies of the visual exhibits if the Court would like us to leave any of them. Also, we have the entire transcript of the May 30th hearing, part of which is in the appendix, but not all. We could also leave that if that would be of value to the Court. Otherwise, we do respectfully request the Court to affirm the decision below in all respects. Thank you. Thank you. Mr. Niederlucky, four minutes. With regard to the copying, you're exactly right. Mr. Beatty never says anywhere that Icos copied his machine, and that's an improper conclusion to draw, and that's one of the reasons that we believe the Court was erroneous in that inference. Also, with regard to Mr. Leone's reliance on Mr. Beatty, in fact, Mr. Leone didn't rely on Mr. Beatty except for a couple of dependent claims in terms of understanding what was in the machine, and that was reliance on Mr. Beatty's knowledge of the machine. How do we know that? Because if you look at the claim charts, Your Honor, that were provided with Mr. Leone's statements for the petition, it actually, in each spot, will say what evidence he was relying on. In almost every case, and certainly in the case of all the independent claims, which you just have to show one is definitely infringed, this is the type of evidence. This is A4687. This is Icos's documentation of its system. For instance, going to the infringement question, Icos says, We don't do triangulation. And their own documentation says the 3D stereo method is based on the triangulation of two images. It goes on to say that the calibration is based on the triangulation principle. At trial, Icos's answer to this was, You know what, all of our documentation about our system was wrong. Everything that we said about our system was wrong. In fact, on that case, their expert, who got up and showed the equation for triangulation, sat there and said that, but said, Well, we don't really do triangulation. We do what we would call bilinear interpolation. And what they did, and what the court unfortunately bought into, was basically a misdirection play. And the bilinear interpolation, nobody questions whether they did that. What is the difference between bilinear interpolation and triangulation? I don't quite understand that. Bilinear interpolation is just basically trying to take a point, related to four other points, and transfer it. So bilinear interpolation was, in this case, transferring simply the ball of one camera into a reference frame for another camera. So all you're doing is saying, Okay, if that ball were in my other camera, here's where it'd be. So you're just taking basically four reference points on what is the calibration plane, and you're moving it over. Now, after that step, both the patent and ICOSIS system, as A6573 shows, this is their own experts' documentation, shows that they do a triangulation step, which is to say, now that we have the two balls in one frame of reference, in the calibration frame, let's do a calculation that's based on the angle of the cameras that will tell us what the height of that ball is. That's a triangulation step. What they told the court was, We do bilinear interpolation. It has nothing to do with whether or not they do the triangulation step. The same thing occurred with the coplanarity. The idea that we don't use this reference plane, we use a different one. It's coplanarity, it's called. In fact, we don't deny they do that. The patent discusses that as another step that you could do. It's not claimed in the broad claims. Again, it was a, we do coplanarity, but, in fact, they also do all the required steps. Could you answer for me, with respect to the scanner patents, they use two cameras. Yes. Now, the HICOS patent, or their system, uses a camera plus a laser beam. Is that correct? I was under the impression from the record that they use two cameras as well. Where's the laser beam come in in their system? In their stereo system? Right. I'm not sure as it relates to the claims how a laser is used, Your Honor. It's not very clear in the record, so. On the obviousness issue, Your Honor, I think the review of the course of termination of obviousness, even as to claim one, was brief at best. We believe that as to claim one, it certainly did not meet its obligations. And we'll have it obvious. Chief Judge Markey used to say all the time when I first came on the bench, we review judgments, not opinions. So the question is whether or not the record has evidence in it to support the finding of obviousness. Yes, and, Your Honor, I think you'll see in our papers that we point out particularly certain circumstances. You think it doesn't, and the other side thinks it does. Yes, and we believe we pointed the record where the court has failed to demonstrate evidence of certain of those required steps in obviousness. Thank you. The case is submitted.